**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DELAWARE VALLEY REGIONAL CENTER, LLC,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY,** *et al.*,<br><br>Defendants. | Case No. 1:23-cv-119 (TNM) |

## <u>MEMORANDUM OPINION</u>

Several Chinese nationals invested in a U.S. center funding a transportation project. They did so for a shot at lawful permanent residency through the "investor visa" program. After they invested, Congress changed the law governing those visas. The investors now claim that they qualify for set-asides in the new law that would allow them to get visas faster. But the Government disagrees. So the Chinese investors, the entity benefitting from their investment, and the regional center sued the Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS"), and USCIS's director (collectively, the "Department") under the Administrative Procedure Act. They contend that a statement on USCIS's website violates the new law's terms and is arbitrary or capricious. The Department moves to dismiss. The Court will grant that motion because what Plaintiffs challenge is not final agency action under the APA. Even if it were, Plaintiffs fail to state a claim that it is contrary to law or arbitrary and capricious.

## I.

### A.

The United States provides "investor visas" to immigrants who help create jobs. *See* 8 U.S.C. § 1153(b)(5). Foreign investors can get those visas in a few different ways. One is to contribute to a USCIS-designated "regional center" that creates jobs. 8 U.S.C. § 1153(b)(5)(E).

Congress established the regional center program as a five-year pilot. *See Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations Act of 1992*, Pub. L. No. 102-395, § 610(a) (Oct. 6, 1992) (previously codified at 8 U.S.C. § 1153 note). It set aside 300 visas a year for foreign investors who meet certain criteria. *See id.* After its initial sunset, Congress periodically reauthorized the program until 2021. *See Da Costa v. Immigr. Inv. Program Off.*, No. 22-cv-1576, 2022 WL 17173186, at *2 (D.D.C. Nov. 16, 2022) (summarizing this history). But in June 2021, the program lapsed for nine months. *See id.*

Then, in March 2022, Congress revamped the regional center program. *See* EB-5 Reform and Integrity Act of 2022 ("Reform Act" or "Act"), Pub. L. 117-103, 136 Stat. 1070 (2022) (codified at 8 U.S.C. § 1153(b)(5)). Apparently, the original program was rife with fraud and raised national security concerns. *See, e.g.*, *Mirror Lake Village, LLC v. Wolf*, 971 F.3d 373, 378 (D.C. Cir. 2020) (Henderson, J., concurring) (noting these problems).[1] So Congress reformed some parts and reauthorized the regional center program through 2027. *See* 8 U.S.C. § 1153(b)(5)(E).

Several of the Reform Act's changes matter here. *First*, the Act reserves visas for three types of foreign investors: twenty percent for investors in rural areas, ten percent for investors in

---

[1] *See also News Releases*, *Grassley, Leahy Introduce New EB-5 Investor Visa Integrity Reforms* (Mar. 18, 2021), https://perma.cc/WB34-F743.

high unemployment areas, and two percent for investors in infrastructure projects.  *See* Pub. L. 117-103, § 102(a)(2), 136 Stat. 1070 (2022).  While these categories are not new, the reserved percentages are.

*Second*, the Act raised the investment amounts required to qualify for these categories. The minimum investment in a targeted employment area or infrastructure project—previously $500,000—is now $800,000.  *See id.* § 102(a)(3)(B), 136 Stat. 1070, 1072.  In other words, the Reform Act set aside more visas for investors in these categories, but it also raised the stakes for them to qualify.

*Third*, the Act sets out new rules for approving business plans.  Each application must include a "comprehensive business plan for a specific investment project," plus "credible economic analysis regarding estimated job creation."  *Id.* § 103(b)(1), 136 Stat. 1070, 1079.  But Congress recognized that USCIS had approved some business plans under the old regime.  So it explained that "an approval before" the Reform Act's enactment "shall be binding for the purposes of the adjudication of subsequent petitions . . . by immigrants investing in the same offering described[.]"  *Id.* § 103(b)(1), 136 Stat. 1070, 1080.  Thus, even if USCIS had approved a business plan long before the Act's enactment, immigrants could still properly invest in it and petition for a visa.  In other words, the Act did not nullify prior business plan approvals or suggest that they must be reauthorized under the Act's new terms.[2]

## B.

After making a qualifying investment, a foreign national may petition USCIS for classification as an immigrant investor using an I-526 petition.  *See* 8 C.F.R. § 204.6.  Such petitions must include fees and evidence that an investor has put "the required amount of capital

---

[2]  The Reform Act includes several exceptions to this rule, but none are relevant.

at risk for the purpose of generating a return." *Id.* § 204.6(a), (j).  A properly filed investor visa

petition is a preliminary step to becoming a lawful permanent resident.  *See Palakuru v. Renaud*,

521 F. Supp. 3d 46, 48 (D.D.C. 2021).

     But obtaining approval of one's investor visa petition is only half the battle.  There must

also be a visa available for the type of immigrant applying.  Often, the odds are slim.  Few

employment-based visas are available each year, *see* 8 U.S.C. § 1151(d), and the same is true for

investor visas, *see id.* § 1153(b)(5)(A).  Complicating matters further, each country cannot claim

more than seven percent of the available visas, regardless of demand.  *See id.* § 1152(a)(2).  In

sum, the number of investor visas is limited, and even if one is available, an immigrant may be

out of luck if too many of his countrymen have already obtained visas.

     When demand exceeds supply for investor visas or for a country, applicants are put on a

waiting list.  *See id.* § 1153(e)(3).  Each investor in the queue is assigned a "priority date"—

typically the day he filed his petition.  22 C.F.R. § 42.54.  To help applicants understand whether

a visa may be available for those who filed when they did, the State Department publishes a chart

each month listing generic cut-off dates for categories of petitions.  *See, e.g.*, *Visa Bulletin for

May 2023*, Dep't of State, https://perma.cc/HNP4-9TAS ("Visa Bulletin Chart").  The May 2023

chart[3] reads:

| Employment-based | CHINA | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|
| 5th Unreserved (including C5, T5, I5, R5) | 08SEP15 | 01JUN18 | C | C |
| 5th Set Aside: Rural (20%) | C | C | C | C |
| 5th Set Aside: High Unemployment (10%) | C | C | C | C |
| 5th Set Aside: Infrastructure (2%) | C | C | C | C |

---

[3] The Court edited this chart to remove irrelevant columns and rows.

The last three rows of the chart correspond to the Reform Act's new categories for rural, high unemployment, and infrastructure investors—visas are "reserved" for these investors.  As the May 2023 chart indicates, visas remain available (designated by a "C," meaning current) under all three categories.  The "5th Unreserved" category corresponds to all other investors.  And it has cut-off dates for Chinese and Indian investors, indicating that investor visas have run out for those countries, at least for now.  *See* 8 U.S.C. § 1153(b)(5)(B)(i)(II) (reserved visas not used within two fiscal years will be made available to those in the unreserved category).

An investor may access this chart to see whether a visa may be available to him.  First, the investor must figure out whether he is in the reserved or unreserved category.  Second, he must compare his priority date with the one listed in the chart.  If his priority date falls *before* the cut-off date in the applicable box, visas remain available for immigrants like him.  But if his priority date falls after the cut-off date, no more visas are available.  If there is a "C" in the applicable box, visas remain available regardless of his priority date.

Recall that the original regional center program lapsed for about nine months while Congress reworked it.  *See supra* Part I.A.  During this time, visa processing was placed on hold.  *See* USCIS, EB-5 Reform & Integrity Act of 2022 Listening Session at 4, https://perma.cc/G29S-QMPP.  After the Reform Act passed, USCIS resumed processing.  But it informed investors that it would process pre-Act petitions based on the prior law and regulations.  *See EB-5 What's New*, Alerts, USCIS, https://perma.cc/ST77-N7B6; *see also Eligibility Requirements*, USCIS Policy Manual, USCIS, Vol. 6, Part G, Ch. 2, https://perma.cc/7BWV-837U.

Thus, investor visa petitions for infrastructure filed before March 2022 need not meet the heightened capital requirements (now $800,000).  Nor may those petitions qualify for the two percent of visas now reserved under the Reform Act.  Indeed, all petitions filed before the

Reform Act's enactment are lumped into the "unreserved" category in the Visa Bulletin Chart. This matters because no visas are available for Chinese nationals in the unreserved category who invested after September 2015.  But visas are available for Chinese nationals if they can qualify for one of the Reform Act's set-asides regardless of when they filed.

**C.**

The crux of this case is that the three investor Plaintiffs want to be considered in the Reform Act's reserved infrastructure category, rather than in the unreserved category.  This is because they are all Chinese nationals who invested $500,000 in infrastructure *before* the Reform Act passed but *after* the 2015 cut-off date for investors in the unreserved category.  *See* Compl. ¶¶ 18–20, ECF No. 1 (filing dates are May 2017, December 2016, and August 2017); *see also* Pls.' Opp'n at 32, ECF No. 19.  Thus, they only currently have a shot at a visa if they are in the reserved infrastructure category.  *See, e.g.*, Visa Bulletin Chart (listing the current cut-off date for unreserved Chinese investors as September 2015).  And the other Plaintiffs—the regional center and transportation authority benefitting from the investments—claim that they suffer reputational harm and potential monetary loss if the investors do not receive visas.  *See* Compl. ¶¶ 12, 79–80.

Plaintiffs contend that a statement on USCIS's website destroys their ability to qualify for reserved infrastructure visas.  The sentence appears on a Questions & Answers page:

> *How can I request that USCIS determine whether a specific capital investment project meets the definition of "infrastructure project"?*
>
> USCIS will determine if the investment is in a qualified infrastructure project *when adjudicating* the regional center's project application.

*See EB-5 Questions and Answers: EB-5 Reform and Integrity Act of 2022*, USCIS, (Apr. 2022), https://perma.cc/FY8V-B8QK (emphasis added) (Questions & Answers).

Plaintiffs argue that the single sentence answer is a policy that contradicts the Reform Act's terms and is arbitrary or capricious. *See, e.g.*, Compl. ¶¶ 62–67, 92, 95, 97.[4]  Their argument as to why is convoluted.  Essentially, Plaintiffs read the phrase "when adjudicating" to mean that USCIS is precluding already-approved business plans from qualifying as infrastructure under the Reform Act. *See, e.g.*, *id.* ¶¶ 59, 61, 64.  And that contradicts the Reform Act's terms because it defines "infrastructure project" as a "capital investment project in a filed or *approved* business plan[.]"  8 U.S.C. § 1152(b)(5)(D)(iv) (emphasis added).[5]  In other words, Plaintiffs claim that under the definition of "infrastructure project," USCIS must decide again whether plans it approved pre-Reform Act qualify as "infrastructure" under the Act's new terms. *See* Pls.' Opp'n at 9, 15.  If previously approved plans could qualify, the investor Plaintiffs could be eligible for the Act's new reserved visas.

USCIS incorporated the Answer into its Manual, explaining that it determines whether a project meets the definition of an infrastructure project "during adjudication of" a business plan. *See* Ex. B at 15.  More, USCIS explains throughout the Manual that the Reform Act's terms apply only to petitions filed on or after its enactment date. *See, e.g.*, *id.* at 13–15 (explaining the standards for pre-Act and post-Act petitions).  In other words, the Reform Act applies only prospectively—to business plans and petitions filed after its enactment.  And it does not contemplate any reassessment of plans approved pre-Act.

The Department argues that Plaintiffs' claims must be dismissed because the Answer is not final agency action reviewable under the APA. *See* Defs.' Mot. to Dismiss (MTD), ECF No.

---

[4]  As explained below, the Court is skeptical that this website text is a policy.  Thus, it uses the term "Answer" to describe it.

[5]  Plaintiffs conveniently lop off the second half of the Answer, which imports the definition of infrastructure from the Reform Act.

17.  Alternatively, it contends that Plaintiffs fail to state a claim under the APA that the Answer is contrary to law or arbitrary and capricious.  *See id.*  That motion is now ripe.[6]

## II.

Under Rule 12(b)(1), this Court presumes that a claim "lies outside [its] limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The plaintiff bears the burden of overcoming that presumption by a preponderance of the evidence.  *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Because subject matter jurisdiction implicates this Court's power to hear a claim, the Court gives the allegations "closer scrutiny" than would be required for a 12(b)(6) motion for failure to state a claim.  *Nepal v. Dep't of State*, 602 F. Supp. 3d 115, 123 (D.D.C. 2022).

To defeat a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  While the complaint need not contain detailed factual allegations, it must provide more than a "formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court may consider "any documents either attached to or incorporated in the complaint, and matters of which [courts] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

---

[6]  Plaintiffs request oral argument on the pending motions.  Because the Court finds the parties' submissions sufficient to decide the issues, it declines this request.  *See* LCvR 7(f).

## III.

The Department argues that both of Plaintiffs' claims fail because the Answer is not final agency action.  Alternatively, it urges that Plaintiffs fail to state an APA claim that the Answer is contrary to law or arbitrary and capricious.

## A.

Under the APA, agency action is limited to a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  For a Court to have subject matter jurisdiction over claims about agency action, that action must also be "final."  5 U.S.C. § 704; *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019).

Agency action is final if it (1) concludes a decision-making process and (2) determines "rights and obligations" or imposes "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Each of these requirements "must be satisfied independently[.]"  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018).  "[A]n agency merely express[ing] its view of what the law requires of a party," is typically not final agency action under the APA.  *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.).

## 1.

First, finality.  The D.C. Circuit recently clarified that "courts should look first to the matrix of statutes and regulations governing [a] specific action" to assess whether it is final.  *Cal. Cmtys. Against Toxics*, 934 F.3d at 641.  In other words, situating the agency action in context helps inform whether it is final.  *See id.*  And the Circuit explained that the finality analysis is "separate and distinct from the test for whether an agency action is a legislative [or interpretative] rule."  *Id.*  The Department largely collapses these two inquiries in its motion to

dismiss.  *See, e.g.*, MTD at 12–16.  Following Circuit precedent, the Court analyzes the finality

issue separately.  Recall that to be final, agency action must be the consummation of a decision-

making process *and* carry legal consequences or create rights and obligations.

There is no evidence that the Answer marks the consummation of USCIS's decision-

making policy in the context of the investor visa statute.  Recall that the phrase Plaintiffs isolate

appears in a list of "Questions and Answers" USCIS posted after the Reform Act passed.  *See*

*supra* Part I.C.  These questions includes others such as "How can an entity become a regional

center?" and "How can I request that USCIS designate an area as a high unemployment area?"

*See id.*  The answers explain which forms to file and often closely track the Reform Act's

language and definitions.  *See id.*  In other words, the website generally helps interested parties

understand the Act's terms and processes.

Now consider what Plaintiffs call the "Policy."  While they provide the question and first

sentence, they leave out the second sentence:

> *How can I request that USCIS determine whether a specific capital investment project*
> *meets the definition of "infrastructure project"?*
>
> USCIS will determine if the investment is in a qualified infrastructure project when
> adjudicating the regional center's project application.
>
> An infrastructure project is a capital investment project in a filed or approved business
> plan, which is administered by a governmental entity (such as a federal, state, or local
> agency or authority) that is the job-creating entity contracting with a regional center or
> new commercial enterprise to receive capital investment under the Regional Center
> Program from alien investors or the new commercial enterprise as financing for
> maintaining, improving, or constructing a public works project.

*See id.*

Read in the context of the Reform Act, the whole answer informs the public that USCIS

determines whether the investment is in a qualified "infrastructure project" (first sentence),

which has a particular statutory meaning (second sentence).  The second paragraph lifts the

definition of "infrastructure project" from the Reform Act.  *See* 8 U.S.C. § 1152(b)(5)(D)(iv).
And USCIS echoes these statements in its Manual, explaining that it "determines whether a
project meets the definition of [an] infrastructure project during adjudication of the Form I-
956"—a form created after the Reform Act passed.  Ex. B at 15; Gov't Reply at 8, ECF No. 21.

The Answer and the Manual cannot reasonably be interpreted as USCIS's "last word" on
anything.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).  Typically, the agency
must "arrive[] at a definitive position on the issue" for it to mark the end of a decision-making
process.  *Darby v. Cisneros*, 509 U.S. 137, 144 (1993) (cleaned up).  Reading both parts of
USCIS's answer reveals that the agency tells interested parties how to *begin* seeking
infrastructure classification under the Reform Act and provides the relevant statutory definition.
USCIS merely explains a preliminary step it takes in adjudicating a petition.

The Manual serves a similar informational function.  It helps investors understand the
statutory standards the agency applies to pre-Reform Act petitions versus post-Act ones.  *See* Ex.
B.  "This is not the stuff of final agency decisionmaking."  *Mass. Coal. for Immigr. Reform v.
DHS*, 621 F. Supp. 3d 84, 95 (D.D.C. 2022) (finding that a DHS Manual failed *Bennett*'s first
prong because it merely helped an agency decide whether environmental analysis was required
by law).

Even if the Answer met *Bennett*'s first prong, it is not final agency action because it
creates no new obligations and has no legal consequences.  *See Bennett*, 520 U.S. at 156.

The D.C. Circuit has explained that analysis under *Bennett*'s second prong is
"pragmatic," and must consider "how agency pronouncements actually affect regulated entities."
*Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020).  Factors to consider include whether the

agency statements had any actual legal effect, the agency's characterization of them, and whether the agency has applied them as if they were binding.  *See id.*

The Answer has no legal effect.  On this point, *Independent Equipment Dealers Association v. EPA* is instructive.  There, the D.C. Circuit held that an agency letter neither imposed obligations nor had any legal consequences because it "merely restated in an abstract setting" the agency's interpretation of regulations.  *See* 372 F.3d at 427.  The Circuit reasoned that the letter "neither announced a new interpretation of the regulations nor effected a change in the regulations themselves."  *Id.*  Rather, it was "purely informational in nature . . . [c]ompelling no one to do anything[.]"  *Id.*  In sum, "an agency merely express[ing] its view of what the law requires of a party," without more, does not qualify as final agency action.  *Id.*  Similarly, in *Catawaba County v. EPA*, the Circuit held that an agency memo did not impose binding legal duties on anyone because it clarified regulated parties' existing duties under the statute and explained the processes they should follow.  *See* 571 F.3d 20, 34 (D.C. Cir. 2009).

So too here.  As explained, the Answer notes that USCIS determines whether a capital project meets the Reform Act's definitions of infrastructure while adjudicating the regional center's application.  *See* Questions & Answers.  And it imports the definition of "infrastructure project" from the Act.  *See id.*  This "purely informational" language restates the law, rather than reinterprets it.  *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427.  USCIS is neither compelling investors or regional centers to do anything nor altering their legal rights.  Instead, it informs them of the process it follows and the legal standards that Congress enacted.  *Cf. id.*; *see also Catawaba County*, 571 F.3d at 34.

The Answer lacks other indicia of legal effect, too.  There is no evidence that USCIS treats its language as an additional, binding legal duty.  To be sure, Plaintiffs point to general

statements in the Manual that it is "controlling" and "is to be followed by all USCIS officers." *See* Pls.' Opp'n at 16, 19; *see also* Compl. ¶¶ 65–66.  But this language does not mean it creates binding legal duties separate from, or on top of, those in the Act itself.  Indeed, telling USCIS officers that they have to follow the Answer is effectively the same as telling them to follow the Reform Act.  Viewed within the context of the Reform Act, the Answer is "all bark and no bite" (if it barks at all) because it has "no independent legal authority." *Cal. Cmtys. Against Toxics*, 934 F.3d at 637.

Plaintiffs raise a few counterarguments, but none persuade.  For *Bennett*'s first prong, they argue that the Answer is attributable to USCIS because it is posted on its website.  *See* Pls.' Opp'n at 16.  And they contend that the Manual contains the "official policies of USCIS" and must be followed.  *See id.* at 16–17.  But neither fact is evidence that the Answer marks the consummation of any agency decision-making process.  This is not a case in which the agency puts forth its "official position about how the Act and its regulations apply to the facts" of a particular center or investor's petition.  *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1208 (D.C. Cir. 2021).  Nor is it a case in which the agency is stating what it believes is "the only permissible interpretation of [a] statute" governing how regulated parties must act.  *Cal. Cmtys. Against Toxics*, 934 F.3d at 636.  Rather, the agency is advising regulated parties generally about what the Act says, using the language of the Act itself, and about USCIS's processing of petitions.

For *Bennett's* second prong, Plaintiffs seize on the Circuit's language that any analysis must be "pragmatic."  *See* Pls.' Opp'n at 18.  They then implore the Court to see that the agency is engaging in senseless policy.  *See, e.g.*, *id.* ("The Policy renders an entire category of investors ineligible for an entire category of visas.).  They argue that USCIS—through the Answer—is

refusing to reassess previously approved business plans under the Act's new terms.  *See id.* at 19.  According to Plaintiffs, this is foolish because "Investor Plaintiffs could receive visas in the reserved visa line—a line that presently has zero investors waiting in it."  *See id.* at 18.

As the Court explains below, it is the Reform Act itself that compels this result, not the Answer.  And the Circuit has noted that "[i]n characterizing the [legal consequences] inquiry as pragmatic, we do not . . . encourag[e] some sort of common-sense approach.  Quite the opposite."  *Cal. Cmtys. Against Toxics*, 934 F.3d at 637.  Rather, the word "pragmatic" refers to a straightforward application of *Bennett's* second prong "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."  *Id.*  Here, as explained, the Answer lacks concrete legal consequences when viewed in the Act's context.  It merely repeats what the Reform Act already requires.  So if the Answer did not exist, the agency would process petitions the same way.

Plaintiffs also suggest that agency action has legal consequences if it "presently and directly limits or defeats a party's ability to realize an advantageous arrangement."  Pls.' Opp'n at 18 (cleaned up).  In the primary case they cite, the Circuit found that an agency had "effectively foreclose[d]" an airline from operating in a way that foreclosed business just "as would an express prohibition."  *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1253 (D.C. Cir. 2021).  The Circuit held that such an action affected the airline's legal rights because it essentially hampered its ability to compete at a particular airport.  *See id.* at 1253–54.

Plaintiffs stretch the caselaw by suggesting that they meet *Bennett*'s second prong on this basis.  For starters, the Circuit has instructed that courts must look to the "matrix of statutes and regulations governing [the] specific action"—here, the investor visa scheme.  *Cal. Cmtys. Against Toxics*, 934 F.3d at 641.  So Plaintiffs' reliance on *Spirit Airlines* is of limited utility.

More, here the investor Plaintiffs chose to put their money "at risk" for a shot at a visa. *See* 8 C.F.R. § 204.6(a).  That investors are judged on the law in place when they filed does not mean that USCIS is altering their legal rights through the Answer as the agency did in *Spirit Airlines*.  *Cf.* 997 F.3d at 1253.  Indeed, recall that the Reform Act allows investors to petition based on infrastructure projects approved before the Act passed.  *See supra* Part I.A.  Congress explained that "an approval before" the Reform Act's enactment "shall be binding for the purposes of the adjudication of subsequent petitions . . . by immigrants investing in the same offering described[.]"  Pub. L. 117-103, § 103(b)(1), 136 Stat. 1070, 1080 (2022).  This language preserves the legal rights of investors by allowing them to tie petitions to pre-Act regional centers.

In sum, Plaintiffs seize on the Answer, label it a "Policy," and argue that the agency is refusing to consider whether already-approved business plans qualify as "infrastructure" under the Act.  But labeling something a policy does not make it final agency action.  *Cf. Mass. Coal. for Immigr. Reform*, 621 F. Supp. 3d at 97.  And as we will see below, Plaintiffs' real gripe is with Congress, which did not make the Reform Act retroactive.  Because the Answer fails both parts of *Bennett*'s test for final agency action, this Court cannot review it under the APA.

## B.

 Even if the Answer and statements in the Manual were final agency action, Plaintiffs fail to state a claim that they are contrary to law or arbitrary and capricious.

## 1.

Faced with a contrary to law claim, this Court "first consider[s] whether Congress has directly spoken to the precise question at issue by looking to the statutory text."  *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 92 (D.C. Cir. 2020) (cleaned up).  And the Court gives

the Reforms Act's terms their "ordinary, contemporary, common meaning, as informed by the context of the overall statutory scheme." *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 21 (D.C. Cir. 2022).

Plaintiffs begin by walking through the text of the Reform Act.  Recall that it reserves certain percentages of visas for investors in infrastructure projects.  *See* 8 U.S.C. § 1153(b)(5)(B)(i)(I).  And it instructs the Secretary to "determine whether a specific capital investment project meets the definition of 'infrastructure project.'"  *Id.* § 1153(b)(5)(B)(iii)(I). The Act defines "infrastructure project" as "projects in both filed or *approved*" business plans. *Id.* § 1153(b)(5)(D)(iv) (emphasis added).  Plaintiffs argue that "approved" business plans include those approved before the Reform Act passed—such as the project they invested in.  *See* Pls.' Opp'n at 24.  And because USCIS is only prospectively classifying projects as infrastructure under the Reform Act, it ignores "approved."  *See id.* at 24–25; *see also id.* at 31 ("Congress imposed an affirmative duty on Defendants to make infrastructure project determinations" for pre-Act plans through the word "approved").

Plaintiffs' textual evidence is thin.  They primarily rely on the definition of "approved" and two canons of construction.  *See* Pls.' Opp'n at 24–25.  Plaintiffs argue that approved means "to give formal sanction to" or "confirm authoritatively," and note that it is in the past tense.  *See id.*  They also cite the conjunctive-disjunctive canon and the canon against superfluity to argue that "filed" and "approved" must mean different things.  *See id.* at 25.  In short, "approved" must refer to pre-Reform Act business plans.  *See id.*  And because USCIS is not reopening those plans and reassessing them under the Act's new terms, it is ignoring "approved."  *See id.*

But that is not the best way to read the Answer or the Act.  Recall that the sentence following the portion Plaintiffs quote imports the precise definition of "infrastructure" from the

Act, including the "filed or approved" language.  *See* Questions & Answers.  It strains credulity

to say that USCIS is somehow ignoring or disregarding half of the statutory definition when it

quotes all of its language.  Simply because the infrastructure definition uses the word

"approved," does not mean that it covers pre-Act plans.  *See* MTD at 15.  Rather, the best

reading of the Answer is that USCIS determines whether *post-Act* investments are in qualified

"infrastructure projects," which has a particular statutory meaning under the Reform Act.

Traditional tools of statutory interpretation require this result.  True, "approved" is a past-

tense verb.  But no canon of construction requires "approved" to mean "approved *before* the

Reform Act passed."  Rather, read naturally and in context, the Answer suggests that to qualify

as an "infrastructure project" under the Act, a business plan need not be approved yet; it is

sufficient that it has been filed.  As the Department notes, this is a change from prior practice.

*See* Gov't Reply at 13.  The old regime's regulations are clear: only approved regional centers

are "eligible to participate" in the immigrant investor program.  *See* 8 C.F.R. § 204.6(m)(4).  In

other words, investors had to tie their visa petition to an already approved regional center.  *See*

*id.* § 204.6(m)(7).  But under the Reform Act, investors may petition based on regional centers

with pending applications too.  *See* Gov't Reply at 13; 8 U.S.C. § 1153(b)(5)(D)(iv).  This fact

cuts against Plaintiffs' restrictive interpretation of "approved" in the infrastructure definition.

More, as the Department points out, *see* MTD at 19, Plaintiffs' reading clashes with

another part of the infrastructure project definition.  An "infrastructure project" involves "a

governmental entity . . . contracting with a regional center or new commercial enterprise to

receive capital investment *under the regional center program described in subparagraph (E)*[.]"

8 U.S.C. § 1152(b)(5)(D)(iv) (emphasis added).  The Reform Act created subparagraph E—its

terms did not exist when Plaintiffs filed.  *See* Pub. L. 117-103, § 103(b), 136 Stat. 1070, 1075

(2022).[7]  The best reading of the Reform Act is that it overhauled the regional center program

and related investor visa provisions, setting aside new percentages of visas and raising the stakes

to qualify for them.  *See id.* § 102(a)(2), 136 Stat. 1070, 1070 (codified at 8 U.S.C. §

1153(b)(5)(B)(i)); *see also id.* § 102(a)(3), 136 Stat. 1070, 1072 (codified at 8 U.S.C. §

1153(b)(5)(C)).  Both updates are a clean break from the prior regime.

    Next consider the effective dates sprinkled throughout the Act.  In the EB-5 visa reform

section—which contains the new set-aside categories—Congress stated that "[t]he amendments

made by this section shall take effect on the date of the enactment of this Act."  *Id.* § 102(e), 136

Stat. 1070, 1075 (codified at 8 U.S.C. § 1153 note).  And in the section reauthorizing and

reforming the regional center program, Congress stated that "[t]he amendment made by this

subsection shall take effect on the date that is 60 days after the date of the enactment of this Act."

*Id.* § 103(b)(2), 136 Stat. 1070, 1100 (2022) (codified at 8 U.S.C. § 1153 note).  Other courts

have noted that similar effective dates are probative (indeed, sometimes conclusive) evidence of

solely prospective application.  *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 257–58

(1994) (explaining that a similar statement "does not even arguably suggest that it has any

application to conduct that occurred at an earlier date"); *Lytes v. D.C. Water & Sewer Auth.*, 572

F.3d 936, 940 (D.C. Cir. 2009) (finding that a delayed effective date was dispositive).

    Plaintiffs note that one of the Act's effective date provisions explicitly states that a part

*excludes* pre-Act petitions.  *See* Pls.' Opp'n at 26 (citing Pub. L. 117-103, § 104(b)(2)(B), 136

---

[7]  Plaintiffs claim that another district court rejected this argument.  *See* Pls.' Opp'n at 35 (citing
*Behring Reg'l Ctr. LLC v. Mayorkas*, No. 22-cv-2487, 2022 WL 2290594 (N.D. Cal. June 24,
2022)); *see also* Pls.' Surreply at 1, ECF No. 24.  But they overstate the relevance and reasoning
of that decision, which assessed whether USCIS correctly understood the Reform Act to
"affirmatively deauthorize[] existing regional centers."  *Behring*, 2022 WL 2290594, at *3.

Stat. 1070, 1103 (2022)).  They reason that because Congress did not include such language in the other effective date provisions, they must *include* pre-Act petitions.  *See id.* at 26–27.

True, language variations in the same statute are presumptively intentional.  *See, e.g.*, *Bittner v. United States*, 143 S. Ct. 713, 720 (2023).  But Plaintiffs make quite a logical leap. Just because one effective date excludes pre-Act petitions explicitly does not mean that the clear text of the prospective effective dates means anything different.  In any event, Plaintiffs ignore that the subsection they cite is an *exception* to a provision that mirrors the take-effect-on-enactment language in §§ 102(e) and 103(b)(2).  *Compare* Pub. L. 117-103, § 104(b)(2)(B), 136 Stat. 1070, 1103 (2022), *with id.* § 104(b)(1), 136 Stat. 1070, 1103 ("Except as provided in paragraph (2), the amendments made by subsection (a) shall take effect on the date of the enactment of this Act").  And recall that courts have found the language Congress used in §§ 102(e) and 103(b)(2) conclusive evidence of prospective application.  In sum, there are strong textual indicators that the Reform Act applies only prospectively.

Finally, the Reform Act explains in a neighboring provision that pre-Act standards apply to pre-Act filers.  For example, investors seeking to "pool" their investments "shall file for classification" under two different statutory sections depending on whether they filed "before [or after] the date of the [Reform Act's] enactment[.]"  *Id.* § 105(a), 136 Stat. 1070, 1103 (codified at 8 U.S.C. 1154(a)(1)(H)).  And that new section of the Act "shall apply to any petition . . . that is filed with the Secretary of Homeland Security on or after the date of the enactment of this Act."  *Id.* § 105(b), 136 Stat. 1070, 1103 (codified at 8 U.S.C. 1154 note).  In sum, all of the textual clues point in the same direction:  the Answer is not contrary to the Reform Act's terms because "approved" only refers to post-Act petitions.

A default rule of interpretation confirms this reading.  Statutes typically only cover conduct after their enactment.  So too for immigration regulations.  *See Sage IT v. Cissna*, 314 F. Supp. 3d 203, 208 (D.D.C. 2018) (rejecting claim that new USCIS regulation should apply retroactively).  This presumption against retroactivity is "deeply rooted in our jurisprudence" because "fairness dictate[s] that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 265–66.  To be sure, the presumption typically applies to protect the objecting party from interference with its "substantive rights, liabilities, or duties[.]" *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).  While there is no need to protect USCIS here, retroactive application could harm post-Act investors because fewer reserved visas would be available to them.  In any event, Plaintiffs disclaim any retroactivity argument, arguing that their reading of "filed or approved" is purely prospective.  *See* Pls.' Opp'n at 27–28; *see also* Pls.' Surreply at 3–4, ECF No. 24.

One final fly in Plaintiffs' ointment.  Even if they are correct that USCIS must reauthorize old regional centers, investor Plaintiffs likely do not qualify for the Reform Act's set-asides.  Recall that the Act also raised the minimum contribution thresholds; infrastructure investments must now exceed $800,000.  *See id.* § 102(a)(3), 136 Stat. 1070, 1072 (codified at 8 U.S.C. § 1153(b)(5)(C)).  But investor Plaintiffs invested only $500,000.  *See* Pls.' Opp'n at 32.  So even if USCIS reclassified their regional center as infrastructure under the Reform Act, investor Plaintiffs are in the red.  It makes little sense to say they could enjoy a benefit of the Reform Act without complying with its burdens.

For all these reasons, Plaintiffs fail to state a claim that the Answer is contrary to the Reform Act's terms.

**2.**

Plaintiffs next argue that USCIS acted arbitrarily and capriciously by posting the Answer and incorporating it into its Manual.  They claim that USCIS failed to (1) articulate a reasoned basis for its action, (2) consider the consequences on the regulated community, and (3) evaluate less burdensome alternatives.  *See* Compl. ¶¶ 95, 97–98.  The Department disagrees.

An agency acts arbitrarily under § 706(2)(A) of the APA when it "refus[es] to consider evidence bearing on the issue before it" or ignores "evidence contradicting its position."  *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  The scope of review under the arbitrary and capricious standard is "narrow" and a court may not "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983).  An agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.*

The Answer is an awkward fit for the arbitrary or capricious standard.  That is because there is no evidence that USCIS is "exercis[ing] its expert discretion," during any decision-making process.  *E.g.*, *id.* at 48; *see also Butte County*, 613 F.3d at 195–96.  Nor does the Court have an administrative record underlying any agency decision.  *See* Defs.' Unopposed Mot. for Leave from Local Rule 7(n) ¶ 5, ECF No. 18 (noting that because Plaintiffs challenge USCIS's interpretation of a statute, there is no relevant administrative record).  Rather, as explained, USCIS is reposting the infrastructure definition from the Reform Act and adding a few explanatory sentences about the law.  *See supra* Part III.A.2.  There is no evidence before the Court that USCIS has made *any* decision (other than choosing to follow the law), let alone that its process in doing so was arbitrary.  True, Plaintiffs complain about a "regulatory gap for infrastructure projects with already-approved business plans," because they will not be classified

as infrastructure under the Act's new terms.  *See* Compl. ¶ 97.  But Congress made that determination by declining to legislate retroactively.  *See supra* Part III.B.1.  Thus, Plaintiffs' complaints are more properly addressed to that branch.

In sum, Plaintiffs provide only conclusory allegations unsupported by facts.  *See, e.g.*, Compl. ¶¶ 95–98.  The Court need not credit them.  *See Iqbal*, 556 U.S. at 686.  They fail to state a claim that USCIS acted arbitrarily or capriciously.[8]

## IV.

For these reasons, the Court will grant the Department's Motion to Dismiss.  A separate Order will issue today.

Dated:  June 7, 2023                                              _____
                                                                                TREVOR N. McFADDEN, U.S.D.J.

---

[8]  The Department also moves to dismiss Plaintiffs' terse suggestions that it did not reasonably explain the Answer, as required by 5 U.S.C. § 555.  *See* MTD at 23–25.  Plaintiffs counter that they are not making a § 555 argument, so the Department's briefing on this point is "irrelevant." *See* Pls.' Opp'n at 4, 45.  Thus, the Court does not address this issue.